**ALDEN F. ABBOTT**
General Counsel
CHRISTOPHER Y. MILLER
KAREN DAHLBERG O'CONNELL
Federal Trade Commission
One Bowling Green, Suite 318
New York, NY 10004
Telephone: (212) 607-2829
Email: cmiller@ftc.gov; koconnell@ftc.gov

**BARBARA D. UNDERWOOD**
Attorney General of the State of New York
CHRISTOPHER L. BOYD
Assistant Attorney General
350 Main Street, Suite 300A
Buffalo, NY 14202
Telephone: (716) 853-8457
Email: Christopher.Boyd@ag.ny.gov

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, and<br><br>**PEOPLE OF THE STATE OF NEW YORK, by BARBARA D. UNDERWOOD**, Attorney General of the State of New York,<br><br>        Plaintiffs,<br><br>        v.<br><br>**CAMPBELL CAPITAL LLC**, a New York limited liability company, also doing business as UNITED PROCESSING SERVICES,<br><br>**KAHL, HEIDENREICH, AND NEMMER LLC**, a New York limited liability company, | Case No.<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER WITH AN ASSET FREEZE, APPOINTMENT OF A RECEIVER, AND OTHER EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

**URBAN, HEIDENREICH, MELENDEZ, AND ASSOCIATES, LLC**, a New York limited liability company, also doing business as CAPITAL ASSETS, SECURITIES, AND HOLDINGS GROUP,

**J & V RECEIVABLES LLC**, a New York limited liability company,

**RICH FINANCIAL LLC**, a Delaware limited liability company,

**BCH & ASSOCIATES LTD.**, a New York corporation, and

**ROBERT HEIDENREICH**, individually and as a principal and owner or de facto owner of CAMPBELL CAPITAL LLC, KAHL, HEIDENREICH, AND NEMMER LLC, URBAN, HEIDENREICH, MELENDEZ, AND ASSOCIATES, LLC, J & V RECEIVABLES LLC, RICH FINANCIAL LLC, and BCH & ASSOCIATES LTD.,

      Defendants.

## **Table of Contents**

I.   INTRODUCTION AND REQUESTED RELIEF                                        1

II.  STATEMENT OF FACTS                                                       3

   A.  Defendants' Illegal Debt Collection Practices ................................................................ 3

     1.  Threats of Arrest and Civil Suits ................................................................ 3

     2.  Attempts to Collect Monies Not Owed ...................................................... 6

     3.  Calls to Third Parties About Alleged Debts ............................................... 8

     4.  Abusive Calls Prohibited by the FDCPA .................................................. 9

   B.  The Defendants ........................................................................................................ 9

III. ARGUMENT                                                                 14

   A.  The Court Has the Authority to Grant the Requested Relief ............................................ 14

   B.  A TRO and Preliminary Injunction are Appropriate and Necessary ................................ 16

     1.  The Standard for Relief .......................................................................... 16

     2.  Governing Substantive Law ..................................................................... 17

        a.  Section 5 of the FTC Act ............................................................... 17
        b.  The Fair Debt Collection Practices Act .......................................... 18
        c.  New York Executive Law § 63(12) and GBL §§ 349, 601 .................................. 19

     3.  Plaintiffs are Likely to Succeed on the Merits ........................................... 20

        a.  Defendants' False, Misleading, and Deceptive Collection Tactics Concerning Non-Existent Criminal and Civil Legal Actions Violate the FTC Act, the FDCPA, and New York Law ...................................................................................... 20
        b.  Defendants' Attempts to Collect Monies Not Owed  Violate the FTC Act, the FDCPA, and New York Law .................................................................................. 23
        c.  Defendants' Calls to Third Parties  Violate the FDCPA and GBL § 601 ............ 24
        d.  Defendants' Abusive Calls to Consumers Violate  the FDCPA and the GBL ..... 25
        e.  Defendants' Failure to Disclose They Are Debt Collectors  Who Are Contacting Consumers to Collect on a Debt  Violates the FDCPA ........................................ 26

     4.  The Balance of Equities Favors Preliminary Injunctive Relief ................................. 26

C.  The Corporate Defendants Are Subject to  Joint and Several Liability as a Common Enterprise .................................................................................................................... 27

D.  Individual Defendant Heidenreich Should Be Held Liable  for the Corporate Defendants' Conduct ...................................................................................................................... 29

E.  The Requested *Ex Parte* Relief Is Necessary to Preserve  the Possibility of Effective Final Relief and to Protect Consumers ..................................................................................... 31

   1.  The Requested Relief .................................................................................. 31

   2.  Restraining Illegal Conduct ........................................................................ 32

   3.  An Asset Preservation Order is Necessary ................................................. 32

   4.  The Court Should Appoint a Receiver ........................................................ 33

   5.  Immediate Access to Defendants' Business Premises, Financial Reporting and Records Preservation, and Expedited Discovery Will Help Identify Assets .............. 34

   6.  The TRO Should be Granted on an *Ex Parte* Basis ................................... 35

IV. CONCLUSION                                                                          36

**Table of Authorities**

C ASES

*Barshay v. Specified Credit Assocs. I, Inc.*, No. 15-CV-1044(DRH)(AYS),
2016 WL 3578993 (E.D.N.Y. June 3, 2016)……………………………………………26

*Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60 (2d Cir. 1993)…………………………..18, 19

*Chiverton v. Fed. Fin. Group, Inc.*, 399 F. Supp. 2d 96 (D. Conn. 2005)…………………………25

*Clomon v. Jackson*, 988 F.2d 1314 (2d Cir. 1993)……………………………………………18

*Del. Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964)……………………………………………27

*Dunn v. Advanced Credit Recovery Inc.*, No. 22-CV-4023(PAE)(JLC), 2012 WL 676350
(S.D.N.Y. Mar. 1, 2012)……………………………………………………………24

*Engler v. Atlantic Res. Mgmt., L.L.C.*, No. 10-CV-968S, 2012 WL 464728 (W.D.N.Y.
Feb. 13, 2012)……………………………………………………………………24

*Fed Express Corp. v. Fed. Expresso, Inc.*, Civ.A.97CV1219RSPGJD, 1997 WL 736530
(N.D.N.Y. Nov. 24, 1997)……………………………………………………………34

*FTC v. 4 Star Resolution, LLC*, No. 15-CV-112S, 2015 WL 7431404
(W.D.N.Y. Nov. 23, 2015)……………………………………………...…20, 28

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)…………………………………27

*FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080 (C.D. Cal. 1994)……………………29

*FTC v. Amy Travel Serv.*, 875 F.2d 564 (7th Cir. 1989)………………………………………...29, 30

*FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011)………………………………...…14

*FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119 (D. Conn. 2008)……………………...18, 31

*FTC v. Check Enforcement*, 2005 WL 167748, No. 03-2115(JWB)
(D.N.J. July 18, 2005)....................................................................22, 23

*FTC v. Check Investors, Inc.*, 502 F.3d 159 (3d Cir. 2007)…………………………………...17

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016)…………………………………...15

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012)…………………………...18

*FTC v. Consumer Health Benefits Ass'n*, No. 10 Civ. 3551(ILG)(RLM),
    2012 WL 1890242 (E.D.N.Y. May 23, 2012)………………………….………27, 30

*FTC v. Crescent Publ'g Group*, 129 F. Supp.2d 311 (S.D.N.Y. 2001)…………………………16
*FTC v. Federal Check Processing, Inc.*, No. 14-CV-122-WMS-MJR,
    2016 WL 5956073 (W.D.N.Y. Apr. 13, 2016)……………..…………...21, 22, 23, 26, 29

*FTC v. Five Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000)……………....…17, 29, 30

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996)………………………………….…14

*FTC v. H.N. Singer*, 668 F.2d 1107 (9th Cir. 1982)……………………………………………...32

*FTC v. IAB Mktg. Assocs.*, 746 F.3d 1228 (11th Cir. 2014)………………………………….…15

*FTC v. Mallett*, 818 F. Supp. 2d 142 (D.D.C. 2011)……………………………………….…26

*FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283 (S.D.N.Y. 2008)…………..17, 18, 29

*FTC v. Millennium Telecard, Inc.*, Civ. Action No. 11-2479 (JLL),
    2011 WL 2745963 (D.N.J. July 12, 2011)……………………………………………33

*FTC v. Minuteman Press*, 53 F. Supp. 2d 248 (E.D.N.Y. 1998)……………………….…...14

*FTC v. Navestad*, No. 09-CV-6329T (MAT), 2012 WL 1014818 (W.D.N.Y. Mar. 23, 2012)…18

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)………………………………….………14

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)…………………………………………..…30

*FTC v. Strano*, 528 Fed. Appx. 47 (2d Cir. 2013)…………………………………………15

*FTC v. Tax Club, Inc.*, No. 13 Civ. 210(JMF), 2014 WL 199514 (S.D.N.Y. Jan. 17, 2014)……28

*FTC v. USA Fin., LLC*, 415 Fed. Appx. 970 (11th Cir. 2011)………………………………...29

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006)…………………………………………17

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988)………………...27

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989)……………………………16, 27

*FTC v. Wyndham Worldwide Corp.*, No. 13-1887 (ES), 2014 WL 2812049
    (D. N.J. June 23, 2014)…………………………………………………………..27

*Horkey v. J.V.D.B. & Assocs.*, 333 F.3d 769, 774 (7th Cir. 2003)……………………………25

iv

*New York v. Abortion Info. Agency*, 69 Misc. 2d 825 (Sup. Ct. N.Y. Co. 1971),
  *aff'd*, 37 A.D.2d 142 (N.Y. App. Div. 1st Dep't 1971)…………………………………16

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20 (1995)….19

*People v. 21st Century Leisure Spa, Int'l*, 153 Misc. 2d 938 (Sup. Ct. N.Y. Co. 1991)………...16

*People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803 (N.Y. 1992)…………………16, 31

*People v. Apple Health & Sports Clubs, Ltd.*, 206 A.D.2d 266
  (N.Y. App. Div. 1st Dep't 1994)…………………………………………………………...19

*People v. Apple Health & Sports Clubs, Ltd.*, 174 A.D.2d 438
  (N.Y. App. Div. 1st Dep't 1991)…………………………………………………………...16

*People v. Empyre Inground Pools, Inc.*, 227 A.D.2d 731
  (N.Y. App. Div. 3d Dep't 1996)…………………………………………………………...19, 31

*Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22 (2d Cir. 1989)…………………………26

*Russell v. Equifax A.R.S.*, 74 F.3d 30 (2d Cir. 1996)…………………………………...…18, 19

*SEC v. First Fin. Group of Texas*, 645 F.2d 429 (5th Cir. 1981)……………………………..33

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)……………………………………16

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972)……………………………32

*Standard Educators, Inc. v. FTC*, 475 F.2d 401 (D.C. Cir. 1973)……………………………30

*State v. Colo. State Christian Coll.*, 76 Misc. 2d 50 (Sup. Ct. N.Y. Co. 1973)…………………19

*State v. Gen. Elect. Co.*, 302 A.D.2d 314 (N.Y. App. Div. 1st Dep't 2003)……………………19

*State v. Princess Prestige*, 42 N.Y.2d 104 (N.Y. 1977)…………………………………………19

*United States v. Central Adjustment Bureau, Inc.*, 667 F. Supp. 370 (N.D. Tex. 1986)……...…25

*United States v. Commercial Recovery Sys.*, 179 F. Supp. 3d 728 (S.D. Tex. 2016)……...…21, 22

*United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184 (2d Cir. 1984)………………………16

*Vongorden v. Second Round, LP*, 897 F.3d 433 (2d Cir. 2018)…………………………………23

ORDERS AVAILABLE VIA ECF

*FTC v. 4 Star Resolution LLC*, No. 15-CV-112S (W.D.N.Y. Feb. 10, 2015), ECF No. 29…15, 34

*FTC v. Consumer Health Benefits Ass'n*, No. 10-3551 (E.D.N.Y. Aug. 3, 2010),
       ECF No. 73-2……………………………………………………………………..…15

*FTC v. Federal Check Processing, Inc.*, No. 14 cv 0122 (W.D.N.Y. Feb. 24, 2014),
       ECF No. 11……………………………………………………………………..15, 34

*FTC v. National Check Registry, LLC*, No. 2014-CV-490-A (W.D.N.Y. Jun. 24, 2014),
       ECF No. 14……………………………………………………………….....15, 34

*FTC v. Navestad*, No. 09-6329 (W.D.N.Y. Jun. 25, 2009), ECF No. 7……………………..15, 34

*FTC v. Pairsys, Inc.*, No. 1:14-cv-11192 TJM/CFH (N.D.N.Y. Sept. 30, 2014),
       ECF No. 7.....................................................................................................15

*FTC v. PCCare247, Inc.*, No. 12-7189 (S.D.N.Y. Oct. 2, 2012), ECF No. 13…………………15

*FTC v. Vantage Point Servs., LLC*, No. 15-CV-0006S (W.D.N.Y. Jan. 5, 2015),
       ECF No. 11……………………………………………………………………...…15, 34

STATUTES

15 U.S.C. § 41…………………………………………………………………………14

15 U.S.C. § 45(a)……………………………………………………………………...2, 14, 17

15 U.S.C. § 53(b)……………………………………………………………………...14

15 U.S.C. § 1692-1692p………………………………………………………………2, 18

15 U.S.C. § 1692c(b)………………………………………………………………….9, 24

15 U.S.C. § 1692d……………………………………………………………………..25

15 U.S.C. § 1692e……………………………………………………………18, 20, 21, 22, 23, 26

15 U.S.C. § 1692*l*……………………………………………………………………14, 15

New York Executive Law § 63(12)………………………………………......2, 3, 14, 15, 16, 19, 31

New York General Business Law § 349………………………………………………3, 14, 15, 19

New York General Business Law § 601…………………………….3, 9, 14, 19, 20, 21, 22, 23, 24, 25

New York General Business Law § 602……………………………………………14, 15, 20

New York General Business Law § 607……………………………………………………………20

## RULES

Fed. R. Civ. P. 1……………………………………………………………………………34

Fed. R. Civ. P. 26(d)………………………………………………………………...…34

Fed. R. Civ. P. 34(b)………………………………………………………………...…34

Fed. R. Civ. P. 65(b)………………………………………………………...………32

## I.    <u>INTRODUCTION AND REQUESTED RELIEF</u>

Plaintiffs the Federal Trade Commission ("FTC") and the People of the State of New York (collectively, "Plaintiffs") respectfully move the Court *ex parte* for a temporary restraining order ("TRO") to immediately halt the activities of a debt collection operation that uses a variety of false, deceptive, and abusive tactics to extract money from consumers.

In telephone calls with consumers, Defendants' collectors rely on illegal debt collection practices that often start with false claims about who the collectors really are. For instance, some collectors pretend to be law enforcement personnel who claim they will have consumers arrested unless they make a payment right away. Others pretend to be process servers or lawyers who falsely claim consumers are about to be served with legal papers at home or work and refer to non-existent motions, complaints, and summonses. Defendants' collectors employ these unlawful tactics to fabricate exigencies and scare consumers into making immediate payments to Defendants.

These tactics are often used by Defendants' collectors to demand more money than Defendants' own records indicate that consumers owe. This practice of seeking monies not owed is encouraged by management, and some collectors openly document it in payment forms they complete. In many instances, the forms show that Defendants' collectors are able to coerce a "settlement" with consumers for amounts greater than the form itself indicates that consumers owe. Similarly, some consumers who fear arrest or the expense of a lawsuit authorize payments even though they do not believe they owe the debt at all.

Defendants utilize additional illegal methods to collect purported debts. For example, Defendants' collectors pressure consumers by calling employers and family members about alleged debts. In addition, Defendants' employees use abusive language in collection calls. For

instance, one employee told a consumer she was "the dumbest son of a bitch that I know," and another told a consumer's father-in-law he was a "dumb a** coal miner."[1]

Since at least 2014, Individual Defendant Heidenreich ("Heidenreich") has led and controlled the operation, which is based in the Buffalo, New York area. Heidenreich is a principal and owner of all of the entities that are defendants (the "Corporate Defendants"), which mostly collect on purported payday loans. Using the alias "Bobby Rich," Heidenreich is directly involved in the day-to-day activities of the operation, doing everything from setting up its PO Box to writing paychecks to employees by hand. Moreover, he has directed and participated in the illegal collection activities by, for instance, encouraging collectors to seek monies not owed and distributing a call script that falsely claims a complaint is about to be filed against consumers by a "legal" office associated with the county where consumers live.

In an effort to hide the operation, Heidenreich frequently changes the company names that collectors use with consumers, many of which are unregistered business names that sound like law firms. Heidenreich also often moves the operation's "headquarters" and uses employees and others to create companies or open business accounts. A significant portion of the money that comes into the enterprise's bank accounts soon leaves those accounts as cash. Accordingly, Plaintiffs seek *ex parte* relief that includes an asset freeze.

Defendants' conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692-1692p, New York Executive Law

---

[1] Declaration of Shanese Spaulding ("Spaulding Decl.") ¶ 8; Declaration of Lisa Albright ("Albright Decl.") ¶ 19. Plaintiffs have submitted 22 declarations with exhibits from former employees, consumers, Plaintiff's investigators, and an FTC forensic accountant in support of their Motion for a TRO. The declarations and exhibits are contained in an Appendix, which is Bates stamped FTC-CC000001 – FTC-CC000535. An index for the Appendix provides the Bates range for each declaration as well as the Tab numbers that appear in the paper service and courtesy copies of the Appendix.

§ 63(12), and New York General Business Law ("GBL") §§ 349 and 601.  To protect consumers and preserve assets for redress to Defendants' victims, Plaintiffs seek an *ex parte* TRO that enjoins Defendants from engaging in illegal debt collection practices, freezes their assets, appoints a temporary receiver over the Corporate Defendants, gives the temporary receiver and Plaintiffs' staff immediate access to Defendants' business premises and records, requires Defendants to disclose their assets and preserve records, and allows limited expedited discovery. Plaintiffs also request that the Court order Defendants to show cause why a preliminary injunction should not issue against them.

## II.    STATEMENT OF FACTS

### A.    Defendants' Illegal Debt Collection Practices

#### 1.    Threats of Arrest and Civil Suits

Instead of identifying themselves as debt collectors, as the law requires, Defendants' employees often fabricate personas when calling consumers.  For example, some of Defendants' employees pretend to work at a sheriff's office in the county where consumers live.  These callers falsely claim that consumers will be charged with financial crimes that sound like they are related to an allegedly outstanding debt.  For instance, one employee of Defendants who pretended to work at the Orange County Sheriff's Office in Florida told a consumer he had a warrant for her arrest for "ACH fraud, defaulting on a loan, and grand larceny."[2]  Similarly, one of Defendants' employees who pretended to work at a sheriff's office in Hillsborough County, New Hampshire told a consumer that he had a warrant for her arrest concerning an unpaid loan.[3]

In both of these cases, Defendants' employees claimed that the consumers were about to be arrested but that the charges could be dropped if they called a purported attorney and reached

---

[2] Declaration of Kristina Bogart ("Bogart Decl.") ¶¶ 1, 3.
[3] Declaration of Jennifer Rodrigue ("Rodrigue Decl.") ¶¶ 1, 4.

a settlement.[4]  At the time, both consumers were caring for their young children and feared what would happen to their children if they were arrested.[5]  One of the callers even told one of the consumers she would need a babysitter and that he would "hate for you to get in trouble in front of your kids."[6]  Minutes after these calls, both mothers called the "attorney," who in reality was just another employee of Defendants, and authorized payment over the phone.[7]

Defendants' employees also pretend to be process servers or to work at law firms when they threaten consumers with arrest.  For instance, one consumer made three payments to Defendants after she was repeatedly threatened with arrest by Defendants' employees who pretended to work at a non-existent law firm, "Anderson Lotempio and Associates."[8]  Defendants even sent this consumer correspondence on fake law firm letterhead, and initially got her to call Defendants by falsely telling the consumer's mother that her daughter had an upcoming court date.[9]  Similarly, one of Defendants' employees who claimed to be a process

---

[4] Rodrigue Decl. ¶ 4 (caller was "very stern and threatened me with arrest and jail if I did not pay" and referred consumer to "attorney" who could "clear the charges and cancel the warrant"); Bogart Decl. ¶ 3 (caller claimed that he would come back to her house to "pick [her] up" on a warrant unless she called an attorney's office to see "if they would take a settlement to drop the charges").

[5] Bogart Decl. ¶ 3 (consumer was at home with her nine-month old son while her husband was at work); Rodrigue Decl. ¶ 4 (consumer was alone at home with her two toddlers).

[6] Rodrigue Decl. ¶ 4.

[7] Bogart Decl. ¶¶ 3-6; Rodrigue Decl. ¶¶ 4-6.  Both consumers subsequently realized they had been deceived when they called the real sheriff's office in their county and were told there was no warrant for their arrest.  Bogart Decl. ¶ 10; Rodrigue Decl. ¶ 19.

[8] Albright Decl. ¶¶ 4-5, 7-12, 16-17; Declaration of Inv. Robert C. Cancellaro ("Cancellaro Decl.") ¶ 42 (no such firm appears in Secretary of State's database).  Consistent with this consumer's experience, two former employees remember a collector in the operation pretending to be an attorney purportedly named "Patrick LoTempio."  Declaration of Thomas Gilewicz ("Gilewicz Decl.") ¶ 18; Declaration of Joyce Selapack ("Selapack Decl.") ¶ 16.  The office in which this collector worked used "Anderson Lotempio Associates" letterhead.  Selapack Decl. ¶ 16, Ex. F at FTC-CC 117.

[9] Albright Decl. ¶¶ 3-4, 13, Ex. D at FTC-CC 134.  *See also* Declaration of Penny Kunitani ¶ 3 ("Kunitani Decl.") (voicemail from alleged attorney stated "We are requiring a verbal statement be submitted to avoid charges being filed and a court date being issued."); Declaration of Louise

server told a consumer she would be charged with money laundering and that the Internal Revenue Service would be contacting her about an allegedly outstanding payday loan.[10]  The consumer, who never even took out a payday loan, nevertheless authorized payment because she was scared by these threats.[11]

Defendants also routinely make false threats to sue consumers or falsely claim that legal proceedings have been initiated.  These false claims are often made by "point callers," who place initial calls to consumers in an attempt to get them to speak with Defendants' collectors.[12]  According to former employees, Defendants' point callers also routinely tell consumers they will soon be served with legal papers at home or work and need to have identification with them.[13]  Some callers also claim that consumers will need to sign legal documents, with their boss as a witness, when they are served.[14]  In truth, Defendants have never filed a lawsuit against a consumer, let alone prepared to file or serve one, and they do not actually employ attorneys or process servers to make calls to consumers.[15]

---

Purdy ("Purdy Decl.") ¶ 3 (collector told consumer she needed to make a payment that day to avoid being arrested).

[10] Declaration of Kristin Carroll-Braun ("Carroll-Braun Decl.") ¶ 7.  *See also* Declaration of John Reggiannini ("Reggiannini Decl.") ¶¶ 3-5 (after consumer received threats of being served with papers, collector told consumer he would have consumer arrested if he did not pay alleged debt); Declaration of Danielle Liles ("Liles Decl.")  ¶ 4 (collector from "United Processing Services" told consumer that if she did not pay a debt in 24 hours, "he would come to my job or residence to arrest me"); Declaration of Leah Perkins ("Perkins Decl.") ¶¶ 3-4 (one of Defendants' employees pretended to be a "private courier" and threatened to "come to [the consumer's] job with law enforcement" to deliver documents and another employee subsequently told the consumer that she would be charged with "malicious intent" for not paying an alleged debt).

[11] Carroll-Braun Decl. ¶¶ 7, 3-5.

[12] Declaration of Douglas Preedom ("Preedom Decl.") ¶ 4 (former employee describing the role of point callers).

[13] Preedom Decl. ¶¶ 14-15; Selapack Decl. ¶ 22.

[14] Selapack Decl. ¶ 26.

[15] Selapack Decl. ¶¶ 23, 18; Preedom Decl. ¶ 14; Gilewicz Decl. ¶ 39.

Heidenreich himself distributed a call script in which Defendants' employees are supposed to claim to work for "the legal offices of ERG assocites [sic] in conjunction with _____ County."[16] The script goes on to suggest that a lawsuit is about to be filed unless the consumer or the consumer's lawyer returns the call:

> Prior to the complaint being active for scheduling against your name. . . . i am giving you 1 oppertunity for either yourself or your legally retained council to contact our office back. . . . Failure to respond will result in further action taken. You have been notified.[17]

Similarly, a consumer who received a call from a purported "State Processor's Office" was told by one of Defendants' employees that he would send the police to her home or job to serve her with a court summons if she did not make a payment.[18] Others were told lawsuits had already been filed against them, including one consumer who was told that a sheriff was *en route* to his house to serve the complaint.[19]

### 2.    Attempts to Collect Monies Not Owed

Another widespread tactic used by Defendants' collectors is demanding more money than the operation's own records indicate that consumers owe. This practice of trying to collect more than the total amount consumers owe (*i.e.* their Balance in Full) is known in the debt collection industry as overbiffing. Heidenreich himself openly encouraged this practice in providing

---

[16] Gilewicz Decl. ¶ 37, Ex. C at FTC-CC 76 (blank in original).

[17] Gilewicz Decl. ¶ 37, Ex. C at 76 (misspellings in original).

[18] Spaulding Decl. ¶ 3. *See also* Declaration of Rickey Emerson ("Emerson Decl.") ¶ 4 (collector told consumer who said he could not pay the amount demanded, which was higher than any debt he ever had, that she would "send papers to me and take me to court."); Declaration of Ruth Cole ("Cole Decl.") ¶ 3 (collector who demanded consumer pay her deceased brother's debt threatened suit using a "threatening tone"); Declaration of Roxie Jones ("Jones Decl.") ¶ 5 (collectors repeatedly threatened to sue and told consumer "we will see you in court").

[19] Declaration of Alessandro Angelo ("Angelo Decl.") ¶ 4. *See also* Albright Decl. ¶ 14, Ex. E at FTC-CC 136 (consumer who had already made three payments to Defendants received a letter stating "a motion was submitted to the office of courts in regards to this debt."); Preedom Decl. ¶¶ 14-15.

instructions to collectors.[20]  He told collectors to "collect as much as you can," including amounts not owed, and even advocated overbiffing by thousands of dollars.[21]

This practice is reflected in payment authorization forms completed by collectors.  The forms used by some collectors allowed them to distinguish between the amount a consumer owed, according to Defendants' records, and the amount collectors told consumers that they owed.[22]  Specifically, these forms have both a "Client Balance" field for the amount a consumer owes and a "Balance Given" or "Original Balance Given" field for the amount collectors tell consumers they owe.[23]  In many instances, such as the example below,[24] the Original Balance Given exceeds the Client Balance:



As in the example above, Defendants' collectors often reach a "settlement" with consumers in which the amount of the settlement exceeds the "Client Balance."[25]

Similarly, Defendants' collectors demand payment from consumers on debts that are not outstanding.  According to a former employee, one of the ways Heidenreich orchestrated

---

[20] Selapack Decl. ¶¶ 24-25 ("Heidenreich encouraged overbiffing in front of a large group of employees"); Gilewicz Decl. ¶¶ 31-33.
[21] Gilewicz Decl. ¶¶ 32-33; Selapack Decl. ¶¶ 25 ("Heidenreich instructed collectors, including myself, to tell consumers they owed as much as a few thousand dollars more than the amount of the debt. . . .").
[22] Gilewicz Decl. ¶ 28, Ex. B at FTC-CC 13-74.
[23] Gilewicz Decl. ¶ 28, Ex. B at FTC-CC 13-74.
[24] Gilewicz Decl. ¶ 28, Ex. B at FTC-CC 30.  *See also* Gilewicz Decl. Ex. B at FTC-CC 13, 21, 24, 26, 31-38, 40-42, 47-48, 51-54, 56-60, 62, 64, 70, and 73-74.
[25] Gilewicz Decl. ¶ 28, Ex. B at FTC-CC 30.  *See also* Gilewicz Decl. Ex. B at FTC-CC 13, 21, 24, 26, 32, 34, 36, 38, 41-42, 47-49, 52-53, 56, 58, 60, 68, and 74.

attempts to collect such debts was by transferring debts that had already been paid to one of his offices to another office for additional collection attempts.[26]

As a result of Defendants' coercive collection tactics, consumers authorize payments for monies they do not even believe they owe.[27]  One consumer, for instance, sent a cashier's check to Defendants after she was threatened with the service of papers at her home or job.[28]  The consumer subsequently confirmed with her bank that she previously had paid the payday loan through deductions from her bank account.[29]  Consistent with Defendants' attempts to collect monies not owed, former employees recall seeing negative balances for consumers in the database Defendants used to track consumer payments, meaning that consumers paid more than Defendants' records indicated that they had owed.[30]

### 3.    Calls to Third Parties About Alleged Debts

To pressure consumers to make payments to Defendants, employees regularly call consumers' relatives and employers about alleged debts.[31]  Such calls are not permitted under the

---

[26] Gilewicz Decl. ¶¶ 34-35.

[27] Carroll-Braun Decl. ¶¶ 3-4, 7-8 (even though consumer had never taken out a payday loan as the Defendants' collectors claimed, she provided her checking account information to two of Defendants' collectors who threatened her with a civil suit and criminal charges).  Others recall collectors demanding amounts greater than their allege debts.  Bogart Decl. ¶ 4 (consumer found demand "confusing" because it was higher than the loan she took out); Emerson Decl. ¶ 4 (the amount demanded "was higher than any debt I ever had"); Purdy Decl. ¶ 4 (the amount of the loan was "much less than" the amount demanded).

[28] Spaulding Decl. ¶¶ 3-5 (consumer made payment because of threats and the fact that collector had accurate personal information about consumer and her family).

[29] Spaulding Decl. ¶ 9.  *See also* Kunitani Decl. ¶¶ 6-7, 12 (consumer's records have no evidence of a loan purportedly secured by a check being deposited in her bank account as collector claimed); Angelo Decl. ¶ 4 (consumer had previously paid loan in full); Reggiannini Decl. ¶¶ 3-4 (consumer did not take out loan, which collector claimed was taken out in Dallas where consumer had not been in decades).

[30] Gilewicz Decl. ¶ 31; Selapack Decl. ¶¶ 28-29.

[31] Jones Decl. ¶ 6 (consumer's boss was called by one of Defendants' collectors about an alleged debt); Emerson Decl. ¶ 3 (Defendants' employee who identified herself as a debt collector told sister of consumer that her brother needed to get a lawyer); Carroll-Braun Decl. ¶ 7 (Defendants' employee posing as a process server told consumer's mother that consumer owed a debt and that

FDCPA, which restricts the circumstances under which a debt collector may contact a third party about an alleged debt. 15 U.S.C. § 1692c(b); *see also* GBL § 601 (restricting calls to consumers' employers). Heidenreich himself encouraged collectors to threaten to make these types of calls.[32]

### 4. Abusive Calls Prohibited by the FDCPA

Defendants' employees also use abusive language in calls with consumers. In one such call, a collector "threatened, screamed, and used profanity" toward a consumer's husband and later left a voicemail accusing the husband of "acting ignorant as usual."[33] Other collectors screamed and cursed at consumers,[34] claimed a consumer was "a deadbeat who cannot pay your f---ing bills,"[35] and called one consumer "the dumbest son of a bitch that I know."[36] Another caller threatened to shoot a consumer's dog,[37] and one used the f-word before telling a consumer's father-in-law in Pennsylvania that he was a "dumb-a** coal miner."[38]

### B. The Defendants

The Defendants' activities are perpetuated through six corporate entities operating as a common enterprise. There is common ownership and control of the enterprise through Heidenreich, and the enterprise shares employees, offices, and internal services.

The six Corporate Defendants are: Campbell Capital LLC ("Campbell Capital"); Kahl, Heidenreich, and Nemmer LLC ("KHN"); Urban, Heidenreich, Melendez, and Associates, LLC

---

a process server was going to serve her at work); Cole Decl. ¶¶ 3-4 (brother and sister of alleged debtor received calls from Defendants about a debt); Albright Decl. ¶ 3 (consumer's mother received a call from one of Defendants' collectors who claimed the consumer had an upcoming court date).
[32] Selapack Decl. ¶ 26.
[33] Carroll-Braun Decl. ¶¶ 12-13.
[34] Reggiannini Decl. ¶ 6.
[35] Rodrigue Decl. ¶ 3.
[36] Spaulding Decl. ¶ 8.
[37] Preedom Decl. ¶ 16.
[38] Albright Decl. ¶ 19.

("UHM"); J & V Receivables LLC ("J&V Receivables"); Rich Financial LLC ("Rich Financial"); and BCH & Associates Ltd. ("BCH").  Heidenreich is or has represented himself as an officer, director, or owner of all of the Corporate Defendants.  Specifically, Heidenreich has held himself out as:  the owner and member of Campbell Capital;[39] a partner, member, and Director of KHN;[40] a Member of UHM;[41] the Managing Partner of J&V Receivables;[42] President and sole member of Rich Financial;[43] and the owner and incorporator of BCH.[44]

Heidenreich runs the enterprise's day-to-day operations, and he is described in internal directories as a "Managing Partner" or "Director."[45]  Heidenreich also gives direction to employees about calls to consumers and hires and fires employees.[46]  Heidenreich is or has been a signatory on bank accounts used by all but one of the Corporate Defendants,[47] and he set up a PO Box used by two of the Corporate Defendants to receive bank statements.[48]  The PO Box was

---

[39] Cancellaro Decl. ¶ 50, Exs. A, T at FTC-CC 310, 406.
[40] Cancellaro Decl. ¶ 50, Exs. V, Q, Y at FTC-CC 414-17, 394, 428.
[41] Cancellaro Decl. ¶ 50, Ex. C at FTC-CC 318.
[42] Cancellaro Decl. ¶ 50, Ex. U at FTC-CC 411-12.
[43] Cancellaro Decl. ¶ 50, Exs. W, Z at FTC-CC 419, 438.
[44] Cancellaro Decl. ¶ 50, Exs. X, F at FTC-CC 424-25, 329.
[45] Selapack Decl. ¶¶ 8, 12, Ex. B at FTC-CC 107; Preedom Decl. ¶ 9, Gilewicz Decl. ¶¶ 6-7; Cancellaro Decl. ¶ 37, Ex. Q at FTC-CC 394.  At times, Heidenreich worked with people who he referred to as partners.  Gilewicz Decl. ¶ 16.
[46] Selapack Decl. ¶¶ 7, 20, 24-26; Gilewicz Decl. ¶¶ 4, 10, 24, 32-33, 37; Preedom Decl. ¶ 14.
[47] Cancellaro Decl. Exs. T-X at FTC-CC 405-25.  Although Heidenreich was not a signatory on any UHM bank accounts that have been identified, he included one of UHM's bank accounts in an application he signed and submitted to be able to process credit card payments.  Cancellaro Decl. ¶ 63, Ex. FF at FTC-CC 480.  Heidenreich is also a member of UHM and signed documents submitted to the New York Secretary of State on its behalf.  Cancellaro Decl. Ex. C at FTC-CC 318.
[48] Cancellaro Decl. ¶¶ 20-22, Exs. G, H at FTC-CC 331-32, 333-51.  A third Corporate Defendant used the same PO Box address on the face of some of its checks.  Cancellaro Decl. Ex. H at FTC-CC 344-46.

also used as the return mailing address in many of the debt collection letters Defendants sent to consumers via email using unregistered business names.[49]

The enterprise used to have as many as four different offices.[50]  These offices were controlled by Heidenreich, who worked out of what was referred to as the "corporate" office or "headquarters."[51]  These offices used integrated services, such as a phone system and an online database used to track collection information about consumers.[52]  The enterprise's finances are also integrated in that over 50 employees have received paychecks from more than one of the entities.[53]  These employees include 21 employees who worked at the enterprise's headquarters.[54]

Heidenreich has taken various steps to hide the enterprise.  He has repeatedly moved its headquarters,[55] which is now its only known office and is located at 1517 Kenmore Avenue in Kenmore, New York.[56]  In addition, he has used employees to set up companies and accounts[57] and even bragged about hiding his involvement to a former employee.[58]

---

[49] Cancellaro Decl. ¶¶ 28, 30, Exs. M, N at FTC-CC 369-81. Two of the unregistered business names used by Defendants that used the PO Box on their letterhead were ERG & Associates and PFG & Associates.  Cancellaro Decl. ¶¶ 28-32, Exs. M, N at FTC-CC 370-71, 381.

[50] Selapack Decl. ¶ 10, Ex. A at FTC-CC 104-05 (internal directories list four offices).

[51] Selapack Decl. ¶¶ 3-4, 8, 10, Ex A at FTC-CC 105 (reference to the PFG (Precision Financial Group) office as "Corporate"); Preedom Decl. ¶¶ 7-9; Gilewicz Decl. ¶¶ 6-7.

[52] Selapack Decl. ¶¶ 10-11, Exs. A, B at FTC-CC 103-08.

[53] Cancellaro Decl. ¶¶ 53-55.

[54] Cancellaro Decl. ¶ 55.

[55] Selapack Decl. ¶ 4; Preedom Decl. ¶¶ 7-8; Declaration of Inv. Erica Law ("Law Decl.") ¶¶ 3-9; Declaration of Inv. Jennifer Hill ("Hill Decl.") ¶¶ 3-5.

[56] Law Decl. ¶¶ 8-10; Hill Decl. ¶¶ 5-7.

[57] Gilewicz Decl. ¶¶ 11, 15 (Heidenreich created business accounts in former employee's name without his knowledge); Selapack Decl. ¶ 37.

[58] Selapack Decl. ¶ 37.

The business names that appear on employee paychecks and the names callers use with consumers also change frequently.[59]  According to former employees, Heidenreich changed the business names used by the enterprise when there were a significant number of complaints about those names on the Internet.[60]  These names were often the same or similar to the names of existing or dissolved entities.  For instance, in the 2015-2016 time frame, Defendants called consumers using the name Marshall Green & Associates, according to former employees,[61] which had been the name of a New York corporation that was dissolved in 2012.[62]

Despite the variety of names used by the operation, there are clear connections between the consumer declarants whose declarations are submitted in support of Plaintiffs' Motion for a TRO and the Defendants' enterprise.  For example, two of the consumer declarants received letters via email from email addresses that appear in internal directories used by the enterprise.[63]  Those directories refer to Heidenreich or Bobby Rich, and the domains for those email addresses are owned or controlled by Heidenreich.[64]  Checks written by two of the declarants were

---

[59] Preedom Decl. ¶¶ 5-6; Gilewicz Decl. ¶¶ 9, 13; Selapack Decl. ¶¶ 6-7, 36.  Heidenreich often wrote paychecks to employees by hand.  Preedom Decl. ¶ 6; Selapack Decl. ¶ 36.
[60] Preedom Decl. ¶ 5; Selapack Decl. ¶ 7; Gilewicz Decl. ¶ 14.
[61] Selapack Decl. ¶ 7; Preedom Decl. ¶ 5.
[62] Cancellaro Decl. ¶ 35.  The dissolved corporation was named "Marshall, Greene and Associates, Inc."
[63] Rodrigue Decl. ¶¶ 7, 17 (consumer received two letters from email addresses using the domain precisionwny.com, including letters@precisionwny.com), Exs. A, E at FTC-CC 231-32, 244-45; Cancellaro Decl. ¶ 27, Ex. L at FTC-CC 364 (GoDaddy records show Heidenreich is the registrant and billing contact for the domain precisionwny.com); Selapack Decl. Ex. A at FTC-CC 104 (internal directory includes the email address letters@precisionwny.com); Liles Decl. ¶ 8, Ex. A at FTC-CC 208-09 (consumer received letter via email from the address admin@unitedprocessing.org); Selapack Decl. Ex. B at FTC-CC 108 (internal directory contains the email address, admin@unitedprocessing.org).
[64] Selapack Decl. Ex. B at FTC-CC 107 (directory refers to "Robert Heidenreich" and "Bobby Rich"), Ex. B at FTC-CC 108 (directory refers to "Bobby Rich"), Ex. A at FTC-CC 104 (directory refers to "Bobby"); Cancellaro Decl. ¶ 27, Ex. L at FTC-CC 364 (GoDaddy records show Heidenreich is the registrant and billing contact for the domain precisionwny.com), ¶ 40,

identified in Defendant UHM's bank records,[65] and payment authorization forms for two declarants were among those provided by a former employee.[66] Similarly, one consumer declarant received a letter from the enterprise, a copy of which was among the materials obtained from inside the organization by a former employee.[67] In addition, one consumer received a call from a collector who used a business name and alias that appears in an internal directory;[68] another was given a callback number that appears on letters used by the enterprise;[69] and others received calls from collectors using business names that former employees and internal directories indicate were used by the enterprise.[70]

---

Ex. R at FTC-CC 396-401 (Heidenreich owns the domain unitedprocessing.org, according to GoDaddy records).

[65] Cancellaro Decl. ¶ 62, Ex. EE at FTC-CC 475-76 (checks from consumer declarants Shanese Spaulding and Kristin Carroll-Braun). *See* Spaulding Decl. ¶¶ 4-5 (consumer sent $600 check to UHM); Carroll-Braun Decl. ¶¶ 7-8, Ex. A at FTC-CC 163 (consumer provided her checking information over the phone to make a payment for $259.95, then later saw in her bank records that a check was prepared on her behalf; that check was made out to UHM).

[66] Gilewicz Decl. ¶ 26, Ex. B at FTC-CC 47, 49 (credit card authorization forms for consumer Declarants Rickey Emerson and Louise Purdy).

[67] Selapack Decl. ¶ 16, Ex. F at FTC-CC 117 (letter dated Oct. 18, 2016 to Lisa Marie Albright); Albright Decl. ¶ 14, Ex. E at FTC-CC 136 (same letter dated Oct. 18, 2016 to Lisa Marie Albright).

[68] A consumer was told he had been sued in a voicemail from "Colin Storm" at "ERG." Angelo Decl. ¶ 4. ERG and ERG & Associates were names frequently used by the operation to call consumers, and the alias "Collin Storm" appears in internal directories. Selapack Decl. ¶ 7, Ex. B at FTC-CC 107-08.

[69] A consumer who received a call from "ERG & Associates" was given the number (855) 764-8940 to call. Perkins Decl. ¶ 7. This number appears in an internal directory provided by a former employee. Selapack Decl. Ex. B at FTC-CC 107.

[70] A consumer who made a payment after speaking with a collector from "ERG and Associates" received a receipt from Michael Charles & Associates, which is one of the names the operation used to bill consumers. *See* Bogart Decl. ¶¶ 4, 6-7, Ex. D at FTC-CC 152; Selapack Decl. Ex. G at FTC-CC 119 (internal handout indicates that the "billing info" for "ERG & Associates" is "Michael Charles & Associates"). In addition, ERG & Associates and Marshall Green & Associates were among the fictitious names most frequently used by the operation. *See* Selapack Decl. ¶ 7; Cole Decl. ¶ 3 (call from ERG & Associates); Reggiannini Decl. ¶ 3 (call from ERG & Associates); Jones Decl. ¶ 3 (call from Marshall Green & Associates). More recently, the operation has been using the initials of Defendant KHN. Cancellaro Decl. ¶ 37, Ex. Q at FTC-

13

III.    <u>ARGUMENT</u>

A.    **The Court Has the Authority to Grant the Requested Relief**

The FTC is an independent agency of the United States government created by the FTC Act, 15 U.S.C. § 41 *et seq.*  The FTC enforces Section 5(a) of the FTC Act, which prohibits "unfair and deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  The FTC also enforces the FDCPA, and a violation of the FDCPA is "deemed an unfair or deceptive act or practice" in violation of the FTC Act.  15 U.S.C. § 1692*l*.  The New York State Office of the Attorney General ("NYAG") is authorized to take action on behalf of the People of the State of New York to enjoin conduct in violation of New York Executive Law § 63(12) and GBL §§ 349 and 601.  Executive Law § 63(12), GBL §§ 349(b) and 602(2).

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b).[71]  This provision grants "broad authority" to federal courts to fashion appropriate remedies for violations of the FTC Act.  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994).  More specifically, this "unqualified grant of statutory authority to issue an injunction under Section 13(b) carries with it the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits."  *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365, (2d Cir. 2011) (quoting *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996)).  This grant of authority also empowers the Court to issue temporary or preliminary relief that is necessary to preserve the possibility of effective final relief, including an order freezing assets, a temporary restraining order enjoining conduct, expedited discovery, the

---

CC 394; Kunitani Decl. ¶ 5 (consumer reached "KHN & Associates" when she returned a call in May 2018).

[71] "The Courts have construed the term 'proper cases' to encompass 'any violation' of a statute administered by the FTC."  *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 260 (E.D.N.Y. 1998).

14

appointment of a temporary receiver, and immediate access to business premises.  *See FTC v. Strano*, 528 Fed. Appx. 47, 49 (2d Cir. 2013) (holding that "implicit" in the FTC Act's "injunction authority is the power of courts to grant ancillary equitable relief"); *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (Section 13(b) "empowers district courts to grant 'any ancillary relief necessary to accomplish complete justice'"); *FTC v. IAB Mktg. Assocs.*, 746 F.3d 1228, 1230 (11th Cir. 2014) (affirming preliminary injunction with asset freeze based on violations of the FTC Act).  The Court's authority to order equitable relief under the FDCPA is similarly expansive, as that statute expressly grants the FTC "[a]ll of the functions and powers" the FTC has under the FTC Act to enforce compliance with the FDCPA.  15 U.S.C. § 1692*l*(a).  As a result, courts within this district and circuit have regularly granted *ex parte* the equitable relief requested here in debt collection cases, including the appointment of a receiver and an asset freeze.[72]

      The corresponding New York State statutes also authorize the relief requested.  Pursuant to New York Executive Law § 63(12) and GBL §§ 349(b) and 602(2), courts are empowered to

---

[72] *See, e.g.*, *FTC v. 4 Star Resolution LLC*, No. 15-CV-112S (W.D.N.Y. Feb. 10, 2015), ECF No. 29 (granting *ex parte* TRO with asset freeze, temporary receiver, financial reporting, immediate access, and expedited discovery in action against debt collectors); *FTC v. Vantage Point Servs., LLC*, No. 15-CV-0006S (W.D.N.Y. Jan. 5, 2015), ECF No. 11 (same); *FTC v. Pairsys, Inc.*, No. 1:14-cv-11192 TJM/CFH (N.D.N.Y. Sept. 30, 2014) ECF No. 7 (granting *ex parte* TRO with asset freeze, temporary receiver, financial reporting, and immediate access); *FTC v. National Check Registry, LLC*, No. 2014-CV-490-A (W.D.N.Y. Jun. 24, 2014) ECF No. 14 (granting TRO with asset freeze, temporary receiver, financial reporting, immediate access, and expedited discovery in action against debt collectors); *FTC v. Federal Check Processing, Inc.*, No. 14 cv 0122 (W.D.N.Y. Feb. 24, 2014) ECF No. 11 (granting *ex parte* TRO with asset freeze, temporary receiver, financial reporting, immediate access, and expedited discovery in action against debt collectors); *FTC v. PCCare247, Inc.*, No. 12-7189 (S.D.N.Y. Oct. 2, 2012) ECF No. 13 (granting *ex parte* TRO with asset freeze, financial reporting, immediate access, and expedited discovery); *FTC v. Consumer Health Benefits Ass'n*, No. 10-3551 (E.D.N.Y. Aug. 3, 2010) ECF No. 73-2 (granting *ex parte* TRO with asset freeze, temporary receiver, financial reporting, and expedited discovery); *FTC v. Navestad*, No. 09-6329 (W.D.N.Y. Jun. 25, 2009) ECF No. 7 (granting *ex parte* TRO with asset freeze, temporary receiver, financial reporting, immediate access, and expedited discovery).

grant wide-ranging equitable relief, including injunctions and asset freezes, to redress the kind of

fraudulent or illegal conduct at issue in this case. *See, e.g., People v. Apple Health & Sports

Clubs, Ltd.*, 80 N.Y.2d 803, 807 (N.Y. 1992).[73]

### B.    A TRO and Preliminary Injunction are Appropriate and Necessary

### 1.    The Standard for Relief

In order to grant a motion for preliminary injunctive relief under the FTC Act, the Court

must "(1) determine that the FTC has a fair and tenable chance of ultimate success on the merits

and (2) consider the equities." *FTC v. Crescent Publ'g Group*, 129 F. Supp. 2d 311, 319

(S.D.N.Y. 2001) (citing, *inter alia*, *United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184, 188

(2d Cir. 1984)).  Unlike traditional actions for an injunction, in cases where, as here, Congress

has expressly provided for injunctive relief against those who violate a statutory prohibition,

irreparable harm is presumed and need not be shown.  *See FTC v. World Wide Factors, Ltd.*, 882

F.2d 344, 346 (9th Cir. 1989); *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975);

*FTC v. Crescent Publ'g Group*, 129 F. Supp. 2d at 319 ("the FTC does not have to show

irreparable harm").  The standard for a grant of injunctive relief under Executive Law § 63(12) is

similar to that under the FTC Act.  *See People v. Apple Health & Sports Clubs, Ltd.*, 174 A.D.2d

438, 438-39 (N.Y. App. Div. 1st Dep't 1991) (plaintiff must demonstrate a "likelihood of

---

[73] Like federal courts within this Circuit, New York State courts have used their equitable powers under these state statutes to impose equitable relief, such as temporary restraining orders, asset freezes, and other appropriate remedies, to protect consumers.  *See, e.g., People v. Apple Health & Sports Clubs*, 80 N.Y.2d 803, 807 (N.Y. 1992) (upholding trial court's grant of TRO freezing defendants' bank accounts); *People v. 21st Century Leisure Spa, Int'l*, 153 Misc. 2d 938, 842 (Sup. Ct. N.Y. Co. 1991) (enjoining owner of company from transferring, withdrawing or otherwise disposing of funds in bank accounts); *New York v. Abortion Info. Agency*, 69 Misc. 2d 825, 830 (Sup. Ct. N.Y. Co. 1971), *aff'd*, 37 A.D.2d 142 (N.Y. App. Div. 1st Dep't 1971) (enjoining defendants "from transferring or otherwise disposing of corporate assets or property" and appointing receiver to preserve assets).

success on the merits, and a balancing of the equities in petitioner's favor," but need not offer "proof of irreparable injury").

### 2.    Governing Substantive Law

#### a.    Section 5 of the FTC Act

Defendants' debt collection practices routinely violate Section 5(a) of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a).[74]  To establish a Section 5(a) claim for "deceptive acts or practices," the FTC must show that Defendants have made or engaged in "[1] a representation, omission, or practice, that [2] is likely to mislead consumers acting reasonably under the circumstances, and [3] the representation, omission, or practice is material."  *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006).[75]

In determining whether conduct is likely to mislead consumers for purposes of the FTC Act, the "court should focus on the overall impression" of the conduct, not just "its literal truth or falsity."  *Medical Billers Network*, 543 F. Supp. 2d at 304.  In particular, the court must consider the alleged misrepresentation "as a whole without emphasizing isolated words or phrases apart from their context."  *FTC v. Five Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).  In evaluating the capacity of the representation to deceive, the court should "look not at the most sophisticated, but the least sophisticated consumer."  *Id.* at 532.  In addition, because the issue is whether the misrepresentation is likely to mislead, "[p]roof of actual deception is unnecessary"

---

[74] "The deceptive acts or practices forbidden by the [FTC] Act include those used in the collection of debts."  *FTC v. Check Investors, Inc.*, 502 F.3d 159, 166-67 (3d Cir. 2007).
[75] The FTC need not show that the deception was "made in bad faith or with intent to deceive."  *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008).  Instead, "it is enough that the representation or practices were likely to mislead consumers acting reasonably."  *Verity*, 443 F.3d at 63.

to establish a violation. *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1073 (C.D. Cal. 2012).

A representation is material under the FTC Act if "it involves information that is important to consumers" and is likely to affect their conduct. *FTC v. Navestad*, No. 09-CV-6329T (MAT), 2012 WL 1014818, at *4 (W.D.N.Y. Mar. 23, 2012). False representations that are expressly made are "presumed material," *Medical Billers Network*, 543 F. Supp. 2d at 304, as are "implied claims" where there is evidence that the defendant "intended to make the claim," *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008).

### b.    The Fair Debt Collection Practices Act

The FDCPA prohibits abusive, unfair, and deceptive practices in connection with a debt collector's collection of debt. 15 U.S.C. § 1692 *et seq.* Congress recognized that "less ethical debt collectors," among other things, "use profane or obscene language, . . . impersonate public officials and lawyers, disclose debtors' personal affairs to employers and engage in other sorts of unscrupulous practices." *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996). The purpose of the FDCPA "is to eliminate such practices." *Id.*

Section 807 of the FDCPA prohibits "any false, deceptive, or misleading representation or means in connection with the collection of any debt," and sets forth a list of prohibited conduct. 15 U.S.C. § 1692e. The list is non-exhaustive and conduct or practices that are not expressly identified in Section 807 may still run afoul of the statute. *See Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 62 (2d Cir. 1993).

As with the FTC Act, courts apply a "least-sophisticated consumer" standard under the FDCPA in order to ensure that the Act "protects all consumers, the gullible as well as the shrewd." *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993). The FDCPA is a "strict

liability statute," *Bentley*, 6 F.3d at 63, and thus a plaintiff "need not show intentional conduct by the debt collector to be entitled to damages," *Russell*, 74 F.3d at 33.

### c.    New York Executive Law § 63(12) and GBL §§ 349, 601

New York Executive Law § 63(12) empowers the Attorney General to seek relief whenever a person or business engages in persistent or repeated "fraud or illegality."  Section 63(12) defines the words "fraud" or "fraudulent" to include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."  N.Y. Exec. Law § 63(12).  A violation of federal, state, or local law constitutes illegality within the meaning of § 63(12).  *See State v. Princess Prestige*, 42 N.Y.2d 104, 105 (N.Y. 1977); *People v. Empyre Inground Pools, Inc.*, 227 A.D.2d 731, 732-733 (N.Y. App. Div. 3d Dep't 1996).  Traditional elements of common law fraud such as reliance, actual deception, knowledge of deception, and intent to deceive are not required to establish liability for statutory fraud.  *See People v. Apple Health & Sports Clubs, Ltd.*, 206 A.D.2d 266, 267 (N.Y. App. Div. 1st Dep't 1994).  The test of fraudulent conduct under § 63(12) "is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud."  *State v. Gen. Elect. Co.*, 302 A.D.2d 314, 314 (N.Y. App. Div. 1st Dep't 2003).  Section 63(12) is "meant to protect not only the average consumer, but also "the ignorant, the unthinking and the credulous."  *See id.*

GBL § 349 provides that "[d]eceptive acts or practices in the conduct of any business . . . in this state are hereby declared unlawful."  GBL § 349.  The meaning of deceptive practices under § 349 is given parallel construction to that of fraud under Executive Law § 63(12), *see State v. Colo. State Christian Coll.*, 76 Misc. 2d 50 (Sup. Ct. N.Y. Co. 1973), and "complements" the standard under Section 5 of the FTC Act, *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995).  In addition to the general

19

prohibition against deceptive acts and practices, N.Y. General Business Law § 601 sets forth a list of specific prohibited debt collection practices, several of which are similar to those prohibited by the FDCPA. *See* GBL § 601; 15 U.S.C. § 1692e. GBL § 602(2) provides the NYAG with statutory authority to bring an action to redress violations of GBL § 601.

### 3. Plaintiffs are Likely to Succeed on the Merits

#### a. Defendants' False, Misleading, and Deceptive Collection Tactics Concerning Non-Existent Criminal and Civil Legal Actions Violate the FTC Act, the FDCPA, and New York Law

As described above, the FTC Act and New York's Executive Law and General Business Law prohibit false and deceptive practices in commerce generally. In addition, the FDCPA and GBL § 601 prohibit false and deceptive practices specifically relating to debt collection. Among other things, the FDCPA makes it illegal for debt collectors to do the following:

- pretend to be affiliated with federal or state governments, 15 U.S.C. § 1692e(1);

- pretend to be an attorney, § 1692e(3);

- falsely tell consumers that nonpayment will result in their arrest, § 1692e(4);

- threaten to take actions collectors do not intend to take (which often applies to threats of civil suits), § 1692e(5);

- falsely accuse consumers of having committed crimes, § 1692e(7); and

- falsely use business names other than the "true name" of the collector's business, § 1692e(14).[76]

Courts regularly find the FTC Act, the FDCPA, and GBL § 601 are violated when collectors engage in these practices. *See*, *e.g., FTC v. 4 Star Resolution, LLC*, No. 15-CV-112S,

---

[76] New York's General Business Law has several similar provisions, including a prohibition on pretending to be "a law enforcement officer, or a representative of any governmental agency" of New York State (GBL § 601(1), threatening to take an action not taken in the "usual course" of business (GBL § 601(7), which often applies to threats of civil suits, and using communications that "simulate in any manner legal or judicial process or which gives the appearance of being authorized, issued or approved by a government . . . or attorney at law when it is not" (GBL § 607(9)).

2015 WL 7431404, at *5 (W.D.N.Y. Nov. 23, 2015) (finding likelihood of success on the merits and granting preliminary injunction where collectors pretended to call from a law firm or government agency and threatened consumers with arrest and civil suits); *FTC v. Federal Check Processing, Inc.*, No. 14-CV-122-WMS-MJR, 2016 WL 5956073, at *9-10 (W.D.N.Y. Apr. 13, 2016) (granting summary judgment where collectors pretended to be "officers" and "investigators" from "Federal Check Processing" who threatened to arrest consumers, accused consumers of fraud, and threatened to pursue legal action against consumers).

Here, Defendants' collectors falsely claim to work for specific sheriff's offices,[77] and they also make less explicit government-affiliation claims, such as purporting to work at a "State Processor's Office"[78] or "in conjunction with _____ County,"[79] which courts have also found violate the FDCPA.  *See U.S. v. Commercial Recovery Sys.*, 179 F. Supp. 3d 728, 731-32 (S.D. Tex. 2016) (FDCPA violated where collector pretended to be "with the county").  Likewise, some of Defendants' employees falsely and explicitly claim to be attorneys in connection with collecting a debt,[80] and others lead consumers to believe they are lawyers by, for instance, claiming to work at a "legal office" and using business names that sound like law firms.[81]  As a result, some consumers even wrote checks to the "Law Office(s)" of Defendant UHM.[82] Defendants' actions are expressly prohibited by the FDCPA and GBL.  15 U.S.C. §§ 1692e(1), 1692e(3); GBL §§ 601(1), 601(9).

---

[77] Bogart Decl. ¶ 3; Rodrigue Decl. ¶ 4.
[78] Spaulding Decl. ¶ 3.
[79] Gilewicz Decl. ¶ 37, Ex. C at FTC-CC 76.
[80] Bogart Decl. ¶ 3; Rodrigue Decl. ¶ 4; Albright Decl. ¶ 16; Gilewicz Decl. ¶ 18; Kunitani Decl. ¶ 3.
[81] Gilewicz Decl. ¶ 37, Ex. C at FTC-CC 76; Cancellaro Decl. ¶¶ 26-29, 33-35.
[82] Cancellaro Decl. ¶ 41 Ex. S at FTC-CC 403-04.  *See also* Spaulding Decl. ¶ 4 (consumer thought Urban, Heidenreich & Melendez was a law firm).

Defendants' fabricated personas as government employees, attorneys, and process servers are a prelude to accusing consumers of committing crimes, threatening them with arrest, or making false claims that civil suits have been or will be filed.[83]  Defendants' threats of arrest are false because Defendants' employees are not sheriff's deputies and have no authority to arrest consumers.  In addition, Defendants have no basis to accuse consumers of committing crimes for which they could be arrested.  The database used by Defendants' collectors only has basic data about consumers and their alleged debts, and therefore it cannot support allegations of criminal conduct.[84]  Courts have found that baseless allegations of criminal conduct violate the FDCPA. *See FTC v. Check Enforcement*, 2005 WL 167748, No. 03-2115(JWB), at *8-9 (D.N.J. July 18, 2005) (threats of arrest and allegations of criminal conduct violated § 1692e(4) and § 1692e(7) of the FDCPA while noting defendants "cannot simply assume that every check writer from whom they seek to collect a debt intended to commit a crime"); *FTC v. Federal Check Processing*, 2016 WL 5956073, at *10 (collectors who had "no basis" to accuse consumers of check fraud violated § 1692e(4), 1692e(5), and 1692e(7)).

Courts have also found FDCPA violations where collectors threatened to sue consumers, yet never filed lawsuits.  *See FTC v. Federal Check Processing*, 2016 WL 5956073, at *10 (collector who never filed civil suits violated Section 807(5)); *U.S. v. Commercial Recovery*, 179 F. Supp. 3d at 732 (threats regarding civil suits were "patently false" where collector did not file lawsuits against consumers).  Similarly, GBL § 601(7) makes it illegal to "[t]hreaten any action which the principal creditor in the usual course of his business does not in fact take."

---

[83] *See* Notes 2-4, 12-19 above.
[84] Selapack Decl. ¶¶ 11, 27 (online Simplicity database used by Defendants contained contact information about consumers, information about the amount of alleged debts, and information about payments made to Defendants); Gilewicz Decl. ¶¶ 23, 29.

Here, Defendants have not sued consumers for defaulting on loans or even prepared for such a suit, according to former employees.[85]  And searches of court records revealed no lawsuits filed by Defendants against consumers.[86]  Therefore, Defendants' threats to sue and claims about alleged pending suits are false and deceptive.  Finally, in pretending to work at places like sheriff's offices and non-existent law firms and by using unregistered business names,[87] Defendants fail to use the "true name" of their business in violation of the FDCPA [Section 807(14)], in addition to the Section 5 of the FTC Act and New York State law [GBL §§ 601(1), 601(9)].

### b.    Defendants' Attempts to Collect Monies Not Owed Violate the FTC Act, the FDCPA, and New York Law

The FDCPA prohibits debt collectors from falsely representing the "character, amount, or legal status of any debt."  15 U.S.C. § 1692e(2)(A).  As a result, courts have found violations where collectors inflate the amount of an alleged debt.  *FTC v. Federal Check Processing*, 2016 WL 5956073, at *9 (collector improperly added interest); *FTC v. Check Enforcement*, 2005 WL 167748, at *9 (collector improperly added purported fees).  Similarly, seeking to collect a debt that the consumer had previously settled is an FDCPA violation, even if the collection attempt was unintentional.  *See Vongorden v. Second Round, LP*, 897 F.3d 433, 437-38 (2d Cir. 2018).  New York law expressly prohibits a debt collector from making a "[c]laim, or attempt or threaten[ing] to enforce a right with knowledge or reason to know that the right does not exist." GBL § 601(8).

---

[85] Selapack Decl. ¶ 23; Preedom Decl. ¶ 14; Gilewicz Decl. ¶ 39.
[86] Cancellaro Decl. ¶¶ 64-65.
[87] *See, e.g.*, Notes 2-3, 8, and 49 above.

Here, Defendants' collectors were directed to inflate the amounts they told consumers they owed by as much as thousands of dollars.[88]  Documents maintained by Defendants reflect this practice, and some consumers settled for amounts higher than their alleged balance.[89] Moreover, Heidenreich deliberately sought to collect on debts that consumers had already paid.[90] Accordingly, Defendants deceptive efforts to collect monies not owed violate the FDCPA, the FTC Act, and New York State law.

### c.    Defendants' Calls to Third Parties Violate the FDCPA and GBL § 601

The FDCPA and New York law expressly prohibit debt collectors from communicating with certain third parties about a consumer's alleged debt.  15 U.S.C. § 1692c(b) (prohibiting collectors from communicating with anyone other than the consumer, his or her counsel, and certain specified parties in connection with the collection of a debt for any purpose other than the acquisition of information about the consumer's location); GBL § 601(4) (prohibiting collectors from communicating with a consumer's employer prior to obtaining a final judgment against a consumer).  In the FDCPA context, courts have found that calls to employers and family members about alleged debts violated the FDCPA.  *See Engler v. Atlantic Res. Mgmt., L.L.C.*, No. 10-CV-968S, 2012 WL 464728, at *2-3 (W.D.N.Y. Feb. 13, 2012) (calls to consumer's supervisor violated the FDCPA); *Dunn v. Advanced Credit Recovery Inc.*, No. 22-CV-4023(PAE)(JLC), 2012 WL 676350, at *3 (S.D.N.Y. Mar. 1, 2012) (calls to consumer's mother disclosing debt violated FDCPA).

---

[88] *See* Notes 20-21 above.
[89] *See* Notes 24-25 above.
[90] Gilewicz Decl. ¶¶ 34-35.

In this case, Defendants' employees routinely call employers and relatives of consumers who allegedly have outstanding debts.[91]  Instead of simply requesting information about a consumer's location, Defendants' employees violate the FDCPA and New York State law by disclosing the existence of purported debts.[92]

### d.    Defendants' Abusive Calls to Consumers Violate the FDCPA and the GBL

The FDCPA also prohibits conduct in connection with the collection of a debt "the natural consequence of which is to harass, oppress, or abuse."  15 U.S.C. § 1692d.  One type of such conduct is the "use of obscene or profane language the natural consequence of which is to abuse the hearer or reader."  15 U.S.C. § 1692d(2).  Courts have held that the use of words like "bitch" and "liar" violates this section of the FDCPA.  *See Horkey v. J.V.D.B. & Assocs.*, 333 F.3d 769, 774 (7th Cir. 2003) (debt collector's statement that consumer should "stop being such a [expletive] bitch" was "abusive as a matter of law"); *Chiverton v. Fed. Fin. Group, Inc.*, 399 F. Supp. 2d 96, 101 (D. Conn. 2005) ("defendant violated § 1692d(2) by calling [consumer] a 'liar'"); *United States v. Central Adjustment Bureau, Inc.*, 667 F. Supp. 370, 375-76 (N.D. Tex. 1986) (debt collector violated FDCPA by calling consumer, *inter alia*, a "god-damn liar" and a "low-down son of a bitch").  New York State law likewise prohibits collectors from acting in "a manner as can reasonably be expected to abuse or harass the debtor."  GBL § 601(6).  As described above, Defendants' collectors use profanity, call consumers deadbeats, and use words like "bitch" in violation of the FDCPA and New York State law.[93]

---

[91] *See* Section II.A.3 above.
[92] *See* Note 31 above.
[93] *See* Section II.A.4 above.

e.    **Defendants' Failure to Disclose They Are Debt Collectors Who Are Contacting Consumers to Collect on a Debt Violates the FDCPA**

The FDCPA requires debt collectors to indicate in initial communications with consumers that are oral that the "debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692(e)(11). Initial oral communications can be voicemails, and the law requires both the disclosure concerning the attempt to collect and the disclosure concerning how the information obtained will be used. *Barshay v. Specified Credit Assocs. I, Inc.*, No. 15-CV-1044(DRH)(AYS), 2016 WL 3578993, at *4 (E.D.N.Y. June 3, 2016) (improper voicemails); *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 26 (2d Cir. 1989) (emphasizing that both disclosures are required in interpreting prior version of FDCPA in which the operative language was identical to the current language). Courts have held collectors pretending to be officers, processors, and investigators violate this provision of the FDCPA. *FTC v. Federal Check Processing*, 2016 WL 5956073, at *10. The same applies here, where Defendants' employees pretend to be members of law enforcement, lawyers, and process servers, and scripts and voicemails left for consumers do not contain either of the required disclosures.[94]

4.    **The Balance of Equities Favors Preliminary Injunctive Relief**

In this case, there is a compelling public interest in halting Defendants' illegal debt collection practices. *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011) ("public interest in ensuring the enforcement of federal consumer protection laws is strong"). Defendants violate the law in egregious ways, pretending to be lawyers and law enforcement personnel who scare consumers into paying alleged debts.[95] The operation literally seeks to extract as much as it can

---

[94] *See* Notes 2-3, 8-10, 13-14, and 16 above; Preedom Decl. ¶ 13.
[95] *See* Section II.A.1 above.

from consumers who are susceptible to Defendants' illegal tactics, regardless of how much

consumers may owe or whether they owe a debt at all.[96]

In contrast, there is no legitimate public interest in continuing to illegally collect on

purported consumer debts.  *See FTC v. World Wide Factors*, 882 F.2d at 347 (upholding district

court finding that public interest outweighed hardship from requiring defendants to "comply with

the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or

concealment") (internal quotes omitted).  As a result, the public interest, which is given greater

weight in balancing the equities, far outweighs Defendants' interests in any event.  *See FTC v.*

*World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) ("public equities must

receive far greater weight" than "private concerns"); *FTC v. Affordable Media, LLC*, 179 F.3d

1228, 1236 (9th Cir. 1999).

### C.    The Corporate Defendants Are Subject to Joint and Several Liability as a Common Enterprise

The Corporate Defendants operate their unlawful debt collection operation as a common

enterprise.  When determining whether a common enterprise exists, courts in the Second Circuit

consider whether "the same individuals were transacting an integrated business through a maze

of interrelated companies . . . ."  *Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964).

Factors that indicate a common enterprise include whether the nominally distinct entities:

"(1) maintain officers and employees in common, (2) operate under common control, (3) share

offices, (4) commingle funds, and (5) share advertising and marketing."  *FTC v. Consumer*

*Health Benefits Ass'n*, No. 10 Civ. 3551(ILG)(RLM), 2012 WL 1890242, at *5 (E.D.N.Y. May

23, 2012).  Of these factors, "no one factor is controlling."  *FTC v. Wyndham Worldwide Corp.*,

No. 13-1887 (ES), 2014 WL 2812049, at *7 (D. N.J. June 23, 2014) (quoting *FTC v. Consumer*

---

[96] *See* Section II.A.2 above.

*Health Benefits*, 2011 WL 3652248, at *5).  In addition, the entities within a common enterprise

may be "separate and distinct" corporations because common enterprise analysis is not an alter

ego or corporate veil piercing inquiry.  *FTC v. 4 Star Resolution*, 2015 WL 7431404 at *3.

Corporate entities that are part of the same common enterprise are jointly and severally liable for

the conduct of other entities in the enterprise.  *See FTC v. Tax Club, Inc.*, No. 13 Civ. 210(JMF),

2014 WL 199514, at *5 (S.D.N.Y. Jan. 17, 2014).

In this case, there is common control of the enterprise through Heidenreich.  He holds

himself out as an officer, member, or owner of all of the Corporate Defendants.[97]  He is referred

to as "Managing Partner" and "Director" in internal directories, and he runs the enterprise on a

daily basis.[98]  Heidenreich often writes paychecks to employees, gives employees direction about

their calls with consumers, and hires and fires employees.[99]  He also is a signatory on many of

the Corporate Defendants' bank accounts,[100] and he set up a PO Box used by at least three of the

Corporate Defendants.[101]

When the operation had four offices, they were integrated through a shared phone system

and database that was used to track interactions with consumers.[102]  The "corporate" or

"headquarters" office also handled the correspondence with consumers who were called by other

offices.[103]  Consistent with being a single organization that shares funds and resources,

employees were often paid by multiple entities within the enterprise.  More than 50 employees of

the operation were paid by more than one of the Corporate Defendants, and 21 of them worked at

---

[97] *See* Notes 39-44 above.
[98] *See* Note 45 above.
[99] *See* Notes 59, 46 above.
[100] *See* Note 47 above.
[101] *See* Note 48 above.
[102] *See* Note 52 above.
[103] Gilewicz Decl. ¶¶ 17, 20; Selapack Decl. ¶¶ 4-5.

the headquarters office.[104]  In debt collection cases, courts have found a common enterprise

existed based on the these factors.  *See FTC v. Federal Check Processing*, 2016 WL 5956073, at

*9 (operation owned and directed by two individuals was a common enterprise).  The same is

true here where Heidenreich himself owns and controls an integrated operation to illegally

collect debts.

> **D.    Individual Defendant Heidenreich Should Be Held Liable
>         for the Corporate Defendants' Conduct**

To obtain injunctive and monetary relief against individuals for injuries to consumers

resulting from a company's conduct, the FTC must establish "(1) that the individuals participated

directly in the wrongful acts or practices or that the individual defendants had the authority to

control the corporate defendants; and (2) that the individuals had some knowledge of the acts or

practices." *Five-Star Auto Club, Inc.*, 97 F. Supp. 2d at 535.

With respect to control, status as a corporate officer or active involvement in the

business, including setting corporate policy, can be sufficient to establish authority to control

unlawful acts or practices.  *Med. Billers Network, Inc.*, 543 F. Supp. 2d at 320 (quoting *Amy

Travel Serv., Inc.*, 875 F.2d at 573).  *See also FTC v. Am. Standard Credit Sys., Inc.*, 874 F.

Supp. 1080, 1089 (C.D. Cal. 1994) ("Authority to control the company can be evidenced by

active involvement in business affairs and the making of corporate policy").  In addition, being a

bank signatory evidences authority to control.  *See FTC v. USA Fin., LLC*, 415 Fed. Appx. 970,

974-975 (11th Cir. 2011).

The knowledge requirement does not require a showing of intent to defraud.  *FTC v. Amy

Travel Serv.*, 875 F.2d at 574.  Rather, the knowledge requirement "may be fulfilled by showing

that the individual had 'actual knowledge of the material misrepresentations, reckless

---

[104] Cancellaro Decl. ¶¶ 53-55.  As the enterprise has become smaller, it has consolidated into a
single office.  Law Decl. ¶¶ 20-21; Hill Decl. ¶ 7.

indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" *Five-Star Auto Club, Inc.,* 97 F. Supp. 2d at 535 (quoting *FTC v. Amy Travel Serv.*, 875 F.2d at 573-74); *accord FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009); *FTC v. Consumer Health Benefits Ass'n*, 2012 WL 1890242, at *5. "[T]he degree of participation in business affairs is probative of knowledge." *Amy Travel Serv., Inc.*, 875 F.2d at 574 (citation omitted); *accord FTC v. Consumer Health Benefits Ass'n*, 2012 WL 1890242, at *5. In addition, being a senior manager is particularly probative in closely-held companies. *See Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception.").

Here, Heidenreich is both a direct participant in the unlawful acts and has the authority to control the Corporate Defendants. Heidenreich has instructed his employees to overbiff consumers and even given such direction in front of a large group of employees.[105] He has distributed an unlawful script that falsely suggests consumers are about to be served with a complaint and explicitly tells callers to pretend they work at "legal offices" that work "in conjunction" with the county where consumers live.[106] In addition, he has encouraged his employees to threaten to call consumers' employers and relatives and orchestrated collection calls to consumers who already paid the Corporate Defendants.[107]

Heidenreich has the authority to control the enterprise as well as actual control over it. Specifically, Heidenreich is a corporate officer or owner of all of the Corporate Defendants; is or

---

[105] *See* Notes 20-21 above.
[106] Gilewicz Decl. ¶ 37, Ex. C at FTC-CC 76.
[107] Selapack Decl. ¶ 26; Gilewicz Decl. ¶¶ 34-35.

has been a signatory on many of their bank accounts; and runs their day-to-day operations.[108]  He

sets policy by giving direction to employees about their calls to consumers, and he hires and fires

employees.[109]

With respect to knowledge, Heidenreich's extensive active involvement in the activities

of the Corporate Defendants is also indicative of his knowledge of their illegal activities.

Moreover, Heidenreich is aware of the Corporate Defendants' misrepresentations, given his

direct involvement in making them.[110]  Accordingly, Heidenreich is personally liable for the

misrepresentations the Corporate Defendants make to consumers under federal law.

New York Executive Law § 63(12) imposes individual liability against "any person" who

"engage[s] in repeated fraudulent or illegal acts."  N.Y. Exec. Law § 63(12).  Further, corporate

officers and directors are liable for fraud if they personally participate in the misrepresentation or

have actual knowledge of it.  *People v. Apple Health and Sports Clubs, Ltd.,* 80 N.Y.2d 803, 807

(1992); *People v. Empyre Inground Pools, Inc.*, 227 A.D.2d 731, 734 (N.Y. App. Div. 3d Dept.

1996  As a result, Heidenreich is also personally liable under New York law.

### E.    The Requested *Ex Parte* Relief Is Necessary to Preserve the Possibility of Effective Final Relief and to Protect Consumers

#### 1.    The Requested Relief

The permanent relief Plaintiffs seek includes disgorgement of the Defendants' wrongful

gains.  *FTC v. Bronson Partners, LLC*, 654 F.3d at 365, 372-73.  To ensure the possibility of

---

[108] *See* Notes 39-47 above.

[109] *See* Notes 16, 20-21, 32, 46 above.

[110] *See* Notes 16, 20-21 above.  Heidenreich was also aware of consumer complaints about the operation.  In 2014, Heidenreich applied for and obtained a merchant account that would allow the operation to process credit card payments.  Cancellaro Decl. ¶ 63, Ex. FF at FTC-CC 478-79. Less than one month after getting the account, it was shut down by the payment processor because too many consumers were seeking to reverse their credit card charges.  *Id.* at 482.  As a result, Heidenreich's operation had to rely on others to process credit card payments.  Selapack Decl. ¶¶ 30-31; Gilewicz Decl. ¶¶ 40-41.

such relief, the proposed TRO Plaintiffs seek under Fed. R. Civ. P. 65(b) is designed to identify and preserve assets.  Specifically, the proposed TRO would:  (1) enjoin the Defendants from engaging in illegal collection practices; (2) freeze the Defendants' assets; (3) appoint a receiver over the Corporate Defendants; and (4) allow immediate access to records, order financial disclosures and records preservation by the Defendants, and authorize expedited discovery.

### 2.    Restraining Illegal Conduct

The proposed TRO enjoins Defendants from engaging in the illegal conduct described above.  Such restrictions are eminently reasonable in light of Defendants' conduct.  *See Mallett*, 818 F. Supp. 2d at 150 ("requiring [Defendant] to comply with federal law cannot rise to a cognizable burden").

### 3.    An Asset Preservation Order is Necessary

An asset freeze is essential to prevent dissipation or waste during the pendency of this litigation.  *FTC v. H.N. Singer*, 668 F.2d 1107, 1113 (9th Cir. 1982) (an asset freeze is appropriate where the objective is "to obtain restitution of moneys fraudulently obtained").  An asset freeze is particularly appropriate where there is a significant risk of the dissipation of Defendants' assets during the course of the litigation.  *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972).  Where, as here, a company's business operations are permeated by fraud, courts have found a strong likelihood that assets may be dissipated during litigation.  *Id.* at 1106.

Here, Defendants flagrantly violate the law and extract as much money as they can from consumers using a variety of patently false claims.  Defendants have also dissipated assets in the course of running their debt collection operation.  Specifically, in the periods for which bank records of the Corporate Defendants are available, the Corporate Defendants obtained more than

$1.7 million from consumers.[111] Yet, more than one third of that amount – over $615,000 – was taken out of corporate bank accounts as cash.[112]

Recent experience with similar operations in this district illustrates the importance of an asset freeze. In *FTC v. 4 Star Resolution*, for instance, approximately $1.6 million was frozen following the *ex parte* issuance of an asset freeze order against a debt collection enterprise, but the defendants in that case still managed to withdraw hundreds of thousands of dollars from one bank before it implemented the TRO.[113] Nevertheless, over $300,000 of that money was recovered in that case, including funds from foreign bank accounts, because there was an asset freeze in place.[114] Accordingly, the Court should order an asset freeze in this case to ensure the possibility of equitable monetary relief and that funds are available for redress to consumers.

### 4.    The Court Should Appoint a Receiver

For many of the same reasons that an asset freeze is appropriate, the Court should also appoint a receiver over the Corporate Defendants. The appointment of a receiver is "particularly necessary" where "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste." *SEC v. First Fin. Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981); *see also FTC v. Millennium Telecard, Inc.*, Civ. Action No. 11-2479 (JLL), 2011 WL 2745963, at *12 (D.N.J. July 12, 2011) ("The appointment of a Receiver is a well-established equitable remedy in instances in which the corporate defendant, through its management, has defrauded members of the public."). Here, the nature of Defendants' conduct, Heidenreich's efforts to hide the enterprise, and the practice of taking cash

---

[111] Declaration of Emil T. George ("George Decl.") ¶ 10.
[112] George Decl. ¶¶ 13-14, Exs. C, D at FTC-CC 491-517.
[113] Certification of Karen Dahlberg O'Connell ¶ 23(a); *FTC v. 4 Star Resolution LLC*, No. 15-CV-112S (W.D.N.Y. Aug. 5, 2015), ECF No. 177 at 38.
[114] *Id*.

out of the operation make dissipation likely, and the appointment of a receiver who can identify and preserve assets and records is appropriate.

### 5.    Immediate Access to Defendants' Business Premises, Financial Reporting and Records Preservation, and Expedited Discovery Will Help Identify Assets

In order to preserve records and to locate assets, the Plaintiffs further request immediate access to Defendants' business premises. Such requests have been granted *ex parte* in several government actions in this district (*e.g., FTC v. 4 Star Resolution*, *FTC v. Vantage Point*, *FTC v. National Check Registry*, *FTC v. Federal Check Processing*, and *FTC v. Navestad*).[115] Again, experience in this district demonstrates the importance of this type of relief. In *FTC v. Brace*, the FTC and the NYAG's request for an *ex parte* TRO was denied and the defendants' principal was served with notice of a TRO hearing.[116] The next day, the principal of the debt collection operation was seen carting electronic equipment out of his office.[117]

Plaintiffs' proposed TRO also requires Defendants to make financial disclosures and preserve records and provides for expedited discovery, which courts in this circuit have also granted.[118] District courts are authorized to depart from normal discovery procedures and fashion discovery by order to meet particular needs in particular cases. Fed. R. Civ. P. 1, 26(d), 34(b); *Fed Express Corp. v. Fed. Expresso, Inc.*, Civ.A.97CV1219RSPGJD, 1997 WL 736530, at *2 (N.D.N.Y. Nov. 24, 1997) (noting that expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction") (quoting commentary to Fed. R. Civ. P. 26(d)).

---

[115] *See* Note 72 above.
[116] Hill Decl. ¶ 9-12.
[117] Hill Decl. ¶ 13.
[118] *See* Note 72 above.

Moreover, the prompt and full disclosure of the scope and financial status of the Defendants' business operations is necessary to ensure that the Court is fully advised regarding (1) the full range and extent of the Defendants' violations of the law, (2) the identities of the injured consumers, (3) the total amount of consumer injury, and (4) the nature, extent, and location of Defendants' assets.

### 6.    The TRO Should be Granted on an *Ex Parte* Basis

The substantial risk of asset dissipation and document destruction in this case, coupled with Defendants' blatantly illegal debt collection practices and efforts to evade detection, justifies *ex parte* relief.  In similar circumstances, courts, including courts in this district, have granted the FTC's request for *ex parte* temporary restraining orders in Section 13(b) cases.[119] Here, Defendants' business operations are permeated by, and reliant upon, unlawful practices. Defendants' conduct – including a fraudulent debt collection scheme, an array of tactics to conceal their identity and location, and moving large sums of money out of their corporate accounts – demonstrates that it is likely that Defendants would conceal or dissipate assets absent *ex parte* relief.  As detailed in the certification of Karen Dahlberg O'Connell, both Defendants' conduct and prior FTC cases involving fraudulent practices support *ex parte* relief here.

---

[119] *See* Note 72 above.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the FTC and the NYAG respectfully request that the Court grant this motion, issue the proposed TRO, and require Defendants to show cause why a preliminary injunction should not issue against them.

Dated:  October 23, 2018                    Respectfully submitted,

BARBARA D. UNDERWOOD                    ALDEN F. ABBOTT
Attorney General of the State of New York        General Counsel

_____/s/_____        _____/s/_____
Christopher L. Boyd                    Christopher Y. Miller
Assistant Attorney General                Karen Dahlberg O'Connell
350 Main Street, Suite 300A                Federal Trade Commission
Buffalo, NY 14202                    Northeast Region
Telephone:  (716) 853-8457                One Bowling Green, Suite 318
Facsimile:  (716) 853-8414                New York, NY 10004
Email:  Christopher.Boyd@ag.ny.gov            Telephone:  (212) 607-2829
                            Facsimile:  (212) 607-2822
*Attorney for Plaintiff State of New York*        Email:  cmiller@ftc.gov
                            Email:  koconnell@ftc.gov

                            *Attorneys for Plaintiff Federal Trade*
                            *Commission*